Jones, Judge,
delivered the opinion of the court:
In the summer of 1934 the Government instituted a cattle purchase program for the threefold purpose of providing wholesome food for distribution to the needy, assisting in the removal of cattle from the acute drought-stricken areas, and assisting in the stabilization of the beef-cattle market through the purchase and utilization of beef which was being produced in excess of the normal requirements of the customary trade channels. This excess consumption was to be accomplished through distribution to persons who otherwise would not be potential consumers.
A severe drought prevailed in the western half of the United States. There was a shortage of feed. At the same time, economic conditions made necessary a distribution of food for human consumption.
It was decided that the program should be administered by the Federal Surplus Eelief Corporation which had been organized as a government corporation by the Secretary of Agriculture, the Federal Administrator of Public Works and the Federal Emergency Eelief Administrator, in their official capacities, pursuant to an Executive Order signed by the President. For convenience it will be referred to as the Corporation.
It was decided that the Corporation should purchase cattle throughout the producing areas, ship them to appropriate concentration points, contract for their processing and distribute the products in accordance with the purposes indicated.
The Corporation at all times was to own the cattle and the products thereof until final distribution.
When shipped to packing plants the Bureau of Animal Industry (B. A. I.) and its inspectors in charge were to be the consignees and were to have supervision of the feeding and care of the cattle until they certified them as in proper condition for delivery to the packer for processing.
*499 Plaintiff was engaged in operating packing plants at Ottumwa, Iowa, and Sioux Falls, South Dakota. Under bids it was allotted certain of the purchased livestock for slaughtering and processing. Some of the animals on account of their physical condition were suitable only for canning purposes.
It was not known how many cattle would be purchased and shipped, so the contracts with the plaintiff and other packers left the number indefinite, allocation to be made from time to time through the B. A. I. inspectors, acting as agents of the Corporation.
On account of the condition of some of these cattle when they arrived at destination the inspector in charge required feeding and yardage before certifying them for delivery for processing.
The issue in this case is the expense of yardage and feeding which plaintiff alleges it is entitled to recover.
It also includes a small claim for storage of a portion of the meat after the processing had been completed.
At packing plants where there were public yards the inspector arranged for the expense of yardage and feeding and the Corporation paid such expense until such time as the cattle could be certified as in condition for delivery to the packer for processing.
At Ottumwa, Iowa, there was no public yard and the cattle were placed in plaintiff’s private yards for care until they could be certified for delivery.
The plaintiff furnished the yard, feed and incident care under the direction and supervision of the B. A. I. inspector who had the cattle in charge. For this expense necessarily incurred the plaintiff seeks recovery.
We think a simple analysis of the contracts, the exhibits, the letters, the schedule, the instructions and the method of handling preclude any other fair conclusion than that the Corporation arranged for and was obligated to pay this expense and that the plaintiff is entitled to recover such expenses as were necessarily incurred prior to the delivery of the cattle to it for slaughter.
The Corporation paid such expenses without question where the cattle were held in public yards. It had complete ownership and supervision of the cattle at all times. It *500 refused to certify the delivery of the cattle until they had been handled in accordance with the inspector’s requirements.
The fact that they were physically present in the plaintiff’s yards did not constitute delivery. They were under the complete control of the inspector until certified for delivery, and he was authorized to incur the essential expense in connection with the handling of such animals. The inspector in charge testified that only those cattle were fed which he ordered be fed, and that there was no difference between what was done at plaintiff’s yards, under his direction, as to feeding and yardage, and what was done at a public yard by the B. A. I. inspector. This constituted a direct and specific contract for the yardage and feed, and since he was authorized to incur this expense on behalf of the Corporation, it became an obligation of the Corporation. Before the cattle were actually certified for delivery the plaintiff had no control whatever over them.
We quote from a circular letter of instructions dated June 5, 1934, issued by the Chief of the Bureau of Animal Industry:
In connection with the cattle purchase under the drought relief project, the .Federal Surplus Belief Corporation has requested permission to consign all shipments of live cattle to BAI inspectors in charge at destination for allocation by such inspectors to the several contractors who have received awards on Schedule 64, FSBC, which deals with the slaughter of the animals, boning of the carcasses, and freezing and canning of the meat. That permission has been granted and in accordance therewith you will take charge of the animals that are billed to you. In this connection the Bureau has also consented to permit direct communication with you by the representatives of the Belief Corporation who are in the field.
* ❖ # ❖ *
Concise weekly reports in duplicate should be submitted giving number of animals received, number of animals died en route, number of animals died in pens, number of animals condemned on ante-mortem inspection, number passed and condemned on post-mortem inspection at each establishment, number of carcasses boned, weight of boned meat, weight of carcasses frozen, cattle and calves given separately, weight of meat con *501 demned on reinspection, weight of meat canned, weight of canned meat condemned, number of cans of each size filled, number of cases of canned meat, each size can, packed, and number of cases, each size can, shipped.
Any unusual service rendered under this schedule should be charged to project 7000 and reports rendered thereon in the regular manner.
We quote in full the letter of instructions dated June 11, 1934, from the Chief of the B. A. I. to the inspector in charge at Sioux Falls, South Dakota:
Bureau telegram of June 11, as follows, is herewith confirmed:
“Bureau inspectors will exercise supervision over care and feeding cattle under Schedule sixty-four while in yards until allocated contractors approving vouchers for customary yardage charges and charges for- necessary amounts feed.”
The above telegram is based on the following letter of June 7 received from the Federal Surplus Belief Corporation:
“In connection with the processing of cattle under Schedule 64, it will probably be necessary to feed and care for cattle in the yards until they can be turned over to processors. Since the cattle are to be consigned to the BAI inspector in charge at the yard concerned and will remain under his supervision until allocated to contractors, I think it would be desirable to inform all inspectors in charge concerned that the feeding and care of cattle will be left to their discretion.
“No arrangements have been made with stockyards for such feeding and care because I understand that the rates at each yard are public, legally controlled and not subject to reduction.
“In the few instances where shipments will be directed to the plant of a contractor, it may be necessary for the BAI inspector at the plant to exercise the supervision and discretion outlined above for stockyard inspectors in charge.”
Both ante-mortem and post-mortem inspection were required. Drought conditions were so severe in the wide-flung western cattle producing area that some of the animals died before loading for shipment; some of them died en route; some of them died in the pens; some of them were condemned after arrival on ante-mortem inspection. In these circumstances to require the plaintiff to assume the addi *502 tional cost of extra care simply because no public stockyards were available, when all such expenses were paid at points where public stockyards were located, would constitute an unjust burden that could have been avoided only by refusing to permit the inspectors to place such cattle in the private yards until they were ready to be certified, and thus placing a far greater burden on the Corporation than the simple expense of permitting the inspector to use the private yards. When the record shows clearly that the inspector had full authority to incur these expenses and was given discretion in the matter as the representative of the Corporation, and when the purposes of the Corporation and its schedule and letters of instruction show that it had full authority to incur such expenses, no other conclusion can be reached than that these essential expenses were a just charge against the Corporation.
There is not even a technical defense to the obligation of the defendant to refund these essential expenses.
There is no issue as to the proper amount of damages. Under date of August 30, 1934, the Director of Procurement of the Corporation, in reply to a letter of inquiry from the plaintiff dated August 27, 1934, stated:
Replying to your letter of August 27 you are advised that it is satisfactory to bill yardage charges on the same scale as the Omaha Public Market, provided the B. A. I. inspector is willing to certify that the charges are reasonable. '
The inspector certified that the charges were reasonable.
The only other question involved in the case is whether the plaintiff is entitled to recover storage charges on products that were on hand in less than carload lots.
The contract provided that storage charges after canning were to be assessed against the Corporation for storage under the following conditions:
In the event of award the contractor will be required to advise the Corporation in writing in such manner as to reach the Corporation at least five days before the canned beef becomes ready for loading into cars. If the Corporation advises the contractor before the expiration of the five day period to ship the quantities so reported, no storage charge shall accrue against the Corporation.
*503 It was the custom to ship in carload lots. At the time of the completion of the contract there was less than a carload ready for shipment. The defendant had furnished forms for plaintiff to use in connection with carload lots, but these forms did not cover notice of less than carload lots ready for shipment. These forms were furnished as a matter of convenience. No special form was necessary, the only requirement being that notice be given in writing. Plaintiff claims the contract price of $0,005 per hundred pounds for the storage of the canned veal from October 19,1934 to April 24, 1935, and of the canned beef from October 19, 1934, to July 2, 1935, a total of $369.56.
While there is substantial merit to plaintiff’s claim that it should be paid for storage from October 19, 1934, to the date of shipment, the contract provided for a notice in writing. Such notice was not given until March 11, 1935. The plaintiff is legally entitled to recover storage on the canned veal only for the period from March 16,1935 (five days after notice given) to April 24,1935, and on the canned beef from March 16,1935 to July 2, 1935.
The plaintiff is entitled to recover the sum of $14,314.92. It is so ordered.
Madden, Judge; Littleton, Judge; and Whaley, Chief Justice, concur.
Whitaker, Judge, took no part in the decision of this case.